**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
MACON DIVISION**

| | | |
|---|---|---|
| **TITUS ANDREWS,** | ) | |
| | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | |
| **v.** | ) | **CIVIL ACTION NO. 5:19-cv-243 (MTT)** |
| | ) | |
| **BOARD OF REGENTS OF THE** | ) | |
| **UNIVERSITY SYSTEM OF GEORGIA,** | ) | |
| | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## ORDER

In this Title VII and Section 1981 action, Plaintiff Titus Andrews, a Fort Valley

State University (FVSU) Cooperative Extension Service agent, claims that the Board of

Regents discriminates against him on the basis of race because he is paid less than

University of Georgia (UGA) Cooperative Extension Service agents.  The Board of

Regents moved for summary judgment.  For the following reasons, that motion (Doc.

36) is **GRANTED**.

## I. BACKGROUND

Andrews, who is African American, has been employed as a Cooperative

Extension Service agent at FVSU, a state university within the University System of

Georgia.  Doc. 44-1 ¶¶ 12, 36-37.  Andrews's duties include helping farmers obtain farm

loans, helping them establish farm management problems, and helping them identify

and address any issues that arose on their farms.  Doc. 26 at 16:22-17:14, 18:5-13.

Andrews does not contend, in his complaint, response brief, or elsewhere, that any individual at FVSU purposefully discriminated against him in any way on account of his race.  Rather, his claims focus on pay disparities between Extension Service agents at FVSU and Extension Service agents at UGA.  On average, UGA Extension Service agents working in agriculture and natural resources (ANR) make approximately $9,000 more than FVSU Extension Service agents working in ANR.  Doc. 46-1 ¶ 9.  An expert witness for Andrews concluded that after accounting for education and years of service, there is a statistically significant pay difference between FVSU ANR Extension Service agents and UGA ANR Extension Service agents.  *Id.* at ¶ 12.  The expert did not opine that there were any statistically significant differences in pay between racial groups; rather, the analysis compared UGA Extension Service agents to FVSU Extension Service agents.  Doc. 58-1.  However, all FVSU Extension Service agents are African American and Extension Service agents at UGA are mostly white.

It is undisputed that individual institutions within the University System of Georgia are responsible for establishing their own compensation plans and setting employee salaries.  Doc. 44-1 ¶ 7.  Nonetheless, institutional decisions must comply with policy set by the Board of Regents, as discussed in more detail below.

Andrews's three count complaint asserts claims for disparate impact, segregation, and disparate treatment.  Doc. 1 at 12-15.  The Board moves for summary judgment as to all three.

## II. DISCUSSION

A court must grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a

matter of law."  Fed. R. Civ. P. 56(a).  A factual dispute is not genuine unless, based on the evidence presented, "'a reasonable jury could return a verdict for the nonmoving party.'"  *Info. Sys. & Networks Corp. v. City of Atlanta*, 281 F.3d 1220, 1224 (11th Cir. 2002) (quoting *United States v. Four Parcels of Real Prop.*, 941 F.2d 1428, 1437 (11th Cir. 1991)); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  The movant may support its assertion that a fact is undisputed by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials."  Fed. R. Civ. P. 56(c)(1)(A).  "When the *nonmoving* party has the burden of proof at trial, the moving party is not required to 'support its motion with affidavits or other similar material *negating* the opponent's claim[]' in order to discharge this 'initial responsibility.'"  *Four Parcels of Real Prop.*, 941 F.2d at 1437-38 (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).  Rather, "the moving party simply may 'show[ ]—that is, point[ ] out to the district court—that there is an absence of evidence to support the nonmoving party's case.'"  *Id.* (alterations in original) (quoting *Celotex*, 477 U.S. at 324).  Alternatively, the movant may provide "affirmative evidence demonstrating that the nonmoving party will be unable to prove its case at trial."  *Id.*

The burden then shifts to the non-moving party, who must rebut the movant's showing "by producing . . . relevant and admissible evidence beyond the pleadings." *Josendis v. Wall to Wall Residence Repairs, Inc.*, 662 F.3d 1292, 1315 (11th Cir. 2011) (citing *Celotex*, 477 U.S. at 324).  The non-moving party does not satisfy its burden "if the rebuttal evidence 'is merely colorable, or is not significantly probative' of a disputed

fact." *Id.* (quoting *Anderson*, 477 U.S. at 249-50).  Further, where a party fails to address another party's assertion of fact as required by Fed. R. Civ. P. 56(c), the Court may consider the fact undisputed for purposes of the motion.  Fed. R. Civ. P. 56(e)(2).  However, "credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge. . . .  The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S. at 255.

**A. Disparate impact**

"[D]isparate impact theory prohibits *neutral* employment practices which, while non-discriminatory on their face, visit an adverse, disproportionate impact on a statutorily-protected group."  *E.E.O.C. v. Joe's Stone Crab, Inc.*, 220 F.3d 1263, 1274 (11th Cir. 2000) (citation omitted).  "[I]n the first stage of a disparate impact case, the complaining party must demonstrate that a respondent uses a particular employment practice that causes a disparate impact on the basis of race, color, religion, sex, or national origin."  *Id.* at 1274 (quotation marks, alteration marks, and citations omitted).  If the plaintiff makes that showing, "[t]he burden of production then shifts to the defendant to establish that the challenged employment practice serves a legitimate, non-discriminatory business objective.  However, even if the defendant satisfies this burden, a plaintiff may still prevail by proving that an alternative, non-discriminatory practice would have served the defendant's stated objective equally as well."  *Id.* (citations omitted).

Andrews identifies three practices that, he argues, "have combined to have a disparate impact [on] African Americans."[1]  Doc. 44 at 8.  Those practices are: (1) the Board of Regents has not enforced its policy provisions that require FVSU to have a pay classification and compensation plan, (2) referring claims of discrimination to local institutions rather than taking centralized action, and (3) designating UGA's program a "Special Public Service Organization" but not applying that designation to FVSU.  *Id.* at 8-9.  For the reasons below, no reasonable jury could conclude Andrews has carried his burden of demonstrating that those practices have disparate impacts on African Americans.

First, though, Andrews has not produced evidence of racial disparities.  Indeed, his entire argument for racial disparities rests on the assumption that evidence of salary disparities among *institutions* equals evidence of salary disparities among *races*.  Doc. 44 at 3-4, 8-10.  But that assumption is both factually and legally unsupported. Andrews's statistical expert, David Macpherson,[2] opined on salary differences between FVSU and UGA.  He concluded that the difference in average pay between institutions was $8,834, which is 2.24 standard deviations away from the expected pay difference. He noted, correctly, that two standard deviations is a threshold courts have previously

---

[1] Andrews cites no authority supporting his argument that he can aggregate different employment practices for his disparate impact claim.  To the contrary, the statute provides that "the complaining party shall demonstrate that *each* particular challenged employment practice causes a disparate impact, except that if the complaining party can demonstrate to the court that the elements of a respondent's decisionmaking process are not capable of separation for analysis, the decisionmaking process may be analyzed as one employment practice."  42 U.S.C. § 2000e-2(k)(1)(B)(i).  The practices Andrews identifies are capable of separation and therefore cannot be combined for purposes of the analysis.  For that reason alone, the Board of Regents is entitled to summary judgment on Andrews's disparate impact claim.  But putting that issue aside, Andrews cannot demonstrate the three practices he identifies produce a disparate impact—whether individually or in aggregate.

[2] Andrews identifies his witness as "David Ferguson;" the report he filed is from a "David Macpherson." Docs. 44-2 ¶ 9; 44-38 at 1.  The Court refers to the expert as David Macpherson.

used in evaluating whether statistical evidence of racial disparities is probative of a disparate impact.  Doc. 44-38 at 5.  However, Macpherson did not consider, nor did he calculate the averages or standard deviation of, salary disparities among races.  Nor did he purport to.  As Macpherson summarized in his conclusion: "These findings provide statistical support for the allegation that FVSU county agricultural agents are paid less than their UGA counterparts."  Doc. 44-38 at 9.  The Board does not dispute that allegation.  Because the statements of material fact establish Macpherson's conclusion, the statistical evidence is unnecessary at this stage.

That explained, Andrews's argument consists of two premises and a conclusion: (1) there are salary disparities between FVSU Extension Service agents and UGA Extension Service agents, and (2) FVSU Extension Service agents are of one racial group and UGA Extension Service agents are of another racial group;[3] therefore, (3) evidence of institutional disparities is necessarily equally strong evidence of racial disparities.  But that is mistaken as a matter of statistics,[4] and Andrews cites no legal authority allowing him to prove his case in such an indirect manner.  To the contrary, and laying aside for the moment the fact that here Andrews compares two separately-governed institutions, the Supreme Court has emphatically rejected exactly the sort of comparison Andrews makes:

---

[3] FVSU Extension Service agents are 100% African American, and UGA Extension Service agents are 83% white and 5% African American.  Docs. 44-38 at 5; 56 at 3.  Andrews's argument in his briefs, which stated UGA was 94% to 95% white, was still insufficient to show that institutional disparities proved racial disparities.  But Andrews had misinterpreted the data on UGA.  Doc. 56 at 3 ("The Court is correct that the remainder does not equal 95% White inasmuch as there are 9.7% unknown and 1.8% other. The more accurate percentage of White Agents is 83.1%.").

[4] The primary reason is simply that institutional disparities aren't the same thing as racial disparities.  The set of FVSU employees is not the same as the complete set of African American employees, nor is the set of UGA employees coterminous with the set of white employees.

Racial imbalance in one segment of an employer's work force does not, without more, establish a prima facie case of disparate impact with respect to the selection of workers for the employer's other positions, even where workers for the different positions may have somewhat fungible skills (as is arguably the case for [the two segments of the workforce being analyzed]). As long as there are no barriers or practices deterring qualified nonwhites from applying for [the higher paid] positions, see n. 6, *supra,* if the percentage of selected applicants who are nonwhite is not significantly less than the percentage of qualified applicants who are nonwhite, the employer's selection mechanism probably does not operate with a disparate impact on minorities.  Where this is the case, the percentage of nonwhite workers found in other positions in the employer's labor force is irrelevant to the question of a prima facie statistical case of disparate impact. . . .   Consequently, we reverse the Court of Appeals' ruling that a comparison between the percentage of cannery workers who are nonwhite and the percentage of noncannery workers who are nonwhite makes out a prima facie case of disparate impact.

*Wards Cove Packing Co. v. Atonio*, 490 U.S. 642, 651-55 (1989), *superseded by statute on other grounds*, 42 U.S.C. § 2000e–2(k).

Further, even if Andrews did have evidence of a statistically significant disparity among races, the usual statistical comparison for disparate impact cases is between the racial composition of the relevant labor pool (or applicant pool) and the racial composition of the defendant's workforce.  *See, e.g.*, *Hazelwood Sch. Dist. v. United States*, 433 U.S. 299, 308 (1977) ("The Court of Appeals was correct in the view that a proper comparison was between the racial composition of Hazelwood's teaching staff and the racial composition of the qualified public school teacher population in the relevant labor market.").  Andrews has not produced any evidence of the relevant applicant pools or labor pools.  For those reasons, salary disparities among the two institutions do not show a racial disparity for purposes of his disparate impact claim.

As for the three employment practices cited by Andrews, he has no evidence that those policies are causally related to any institutional disparities, let alone to racial disparities.

Regarding the lack of a pay classification plan, Andrews cites a portion of the Board of Regents "Human Resources Administrative Practice Manual" that states that the University System "has established a position classification system . . . based on job categories designed to group positions which have similar duties, have approximately the same levels of complexity and responsibility, require similar training and experience at the time of recruitment, may be compensated at the same general levels of pay, and ensure the University System member institutions meet federal reporting requirements." Doc. 44-25 at 1-2.[5]  The policy further provides that local institutions may create "campus specific job categories" and "establish market competitive pay structures for classified positions."  *Id*. at 4.  Andrews claims the Board of Regents failed to enforce that policy, which contributed to institutional disparities.  That argument fails for several reasons.

It is undisputed that in late 2016, FVSU contracted with the Carl Vinson Institute of Government to develop a classification system, although that system has not yet been fully implemented.  Doc. 44-1 ¶ 40.  The study was published in January 2018, and Andrews's salary was within the range specified for his position by the study.  Doc. 36-4 ¶ 10.  Andrews has presented no evidence that his pay—or that of his colleagues—would be higher if FVSU had fully implemented the plan.  In any event, Dr. Mark Latimore, the Administrator of FVSU's Extension Service program, testified that

---

[5] Andrews's brief does not cite the actual policy requiring that plan—Board of Regents policy 8.2.14—despite mentioning it in his statement of material facts.  Doc. 44-2 ¶ 16.  The policy provides that "[e]ach University System of Georgia (USG) institution shall establish a compensation plan consistent with the guidelines issued in the Human Resources Administrative Practices Manual . . . Institutions may adjust employee compensation as a result of multiple factors, including, but not limited to, merit adjustments, promotions, position reclassification, counteroffers, in-range adjustments. Adjustments to employee compensation is an institutional decision and should be consistent with the approved institutional compensation plan."  Doc. 36-5 at 9.

the reason FVSU has not fully implemented the plan is lack of funds.  Doc. 31 at 14:13-23, 75:13-77:7.[6]

Second, Andrews has produced no evidence that the Board of Regents's practice of "mak[ing] no inquiry when claims of discrimination are made against it" causes racial disparities.  Doc. 44 at 8.  In fact, he does not even argue causation in his brief.  *See generally* Doc. 44 at 8-10.  His reference to "claims of discrimination" is vague, and he has not produced evidence that such "claims" are mishandled under the current system.  Similarly, the fact that the Board of Regents "takes no action to determine when its policies and/or federal laws are being followed" is meaningless absent evidence that such action is needed.  Doc. 44 at 8.  And to the extent the Board of Regents fails to enforce "its policies," the only policy Andrews identifies is the policy requiring a classification system, discussed above.

Third, Andrews argues that the Board of Regents designated UGA as a "special public service organization."  Doc. 44 at 9.  Andrews baldly asserts that because of this designation, the General Assembly funds UGA's Extension Service program on a line-item basis.  *Id*.  By implication, and only by implication, Andrews asserts that because the Board has not designated FVSU's Extension Service a "special public service organization," the General Assembly does not fund FVSU's Extension Service on a line-item basis.  *Id*.  There is no evidence that the Board, whether by its special public

---

[6] Andrews responds that "Defendant has alleged that there are no funds with which to increase FVSU's ANR Agents' pay, but has presented no evidence that this is true, only conclusory statements from witnesses."  Doc. 44 at 12.  Though it hardly needs noting, statements from witnesses in affidavits and depositions are evidence.  If Andrews's counsel believed that Latimore's statements about funding were conclusory, she could have pressed him on it during the deposition.

service designation or, for that matter, by any means, controls[7] whether the General Assembly budgets on a line-item basis, and Andrews does not articulate the reasoning behind that argument.

Accordingly, the Court attempts to piece together his argument from the evidence he cites in his brief:

> (1) Board of Regents Policy 5.4 lists UGA's Cooperative Extension Service under the heading "Special Public Service Organizations" in the Board of Regents policy manual.  Doc. 36-8 at 11.
>
> (2) A governor's budget report for FY2019 contains a line recommending an increase in the Cooperative Extension Service.  Doc. 44-32 at 7.
>
> (3) UGA's allocation is broken out as a separate line item in the appropriations bill, and FVSU's is not.  As a result, FVSU's president has the ability to divert Extension Service funds to other programs.  Doc. 32 at 49:13-52:23.
>
> (4) During Fred Harrison's time at the FVSU Extension Service, the president did divert Extension Service funds to other programs.  Doc. 41 at 39:7-40:9.

The third item provides some evidence that the General Assembly's line-item funding for UGA's Extension Service gives UGA executives less discretion in how they use Extension Service funds.  It is perhaps evidence that if the General Assembly were to fund the FVSU Extension Service on a line-item basis, FVSU would have less discretion to divert money from its Extension Service.  But, again, there is no evidence that line-

---

[7] Surprisingly, nothing in the record explains just what a "special public service organization" is.  But it is clear what it is not—a mechanism or device to control legislative funding decisions.

item funding results from any Board policy.  And there is no evidence that any additional money for FVSU's Extension Service would be used to augment salaries.

On the issue of legislative funding, Jason Matt, the Executive Budget Director for the Board of Regents, testified that the line-item budgetary designation is a decision made by the General Assembly, with the input of the Governor's Office, and that Policy 5.4 "ha[s] no budgetary implications and do[es] not impact funding recommendations or decisions."  Doc. 36-8 ¶¶ 1-2, 6-8, 12, 16.  Andrews's argument—that the Board of Regents's not listing FVSU in Policy 5.4 somehow causes the General Assembly to roll Extension Service money into FVSU's bulk budget, which causes FVSU executives to divert Extension Service money, which causes FVSU Extension Service agents like Andrews to be paid less—is speculative, attenuated, and unsupported by the evidence. Contrary to Andrews's unsupported argument, Matt testified any special funding initiative dollars are not allocated by the Board, but "are made to the institutions based on legislative intent."  Doc. 32 at 24:2-5.

For those reasons, Andrews has not made out a prima facie case of disparate impact.  He has not produced evidence of racial disparities or evidence that any of the three practices he points to, alone or in combination, have caused racial disparities.

Additionally, to the extent applicable, the Board of Regents has amply demonstrated business necessity for the challenged practices.  The Board adduced evidence, which was not refuted, that FVSU does not have the funding to fully implement the Carl Vinson Institute's pay classification plan, which would not in any event remedy Andrews's perceived pay disparities.  As to the Board's practice of referring claims of discrimination to local institutions, the Vice Chancellor for Legal

Affairs testified that "it is more efficient and effective for the institutions . . . to take the lead in responding to EEOC charges that their employees have filed[,] as the institutional staff have greater familiarity with their own institution and the particular circumstances of the case . . . .  In addition, the staff at the University System Office would not have sufficient resources to handle this function on a routine basis . . . for all 26 colleges and universities and 48,000 employees."  Doc. 36-9 ¶ 7.  Again, Andrews has not produced evidence refuting that.  Finally, the Board does not have a practice that causes the General Assembly to budget on a line-item basis and so, of course, the Board offers no business necessity for such a practice.  For those reasons, the Board has demonstrated business necessity for the relevant practices, and Andrews has not refuted those reasons or shown alternative practices that would accomplish the Board's objectives equally well.[8]

Therefore, summary judgment is appropriate on Andrews's disparate impact claim.

## B. Segregation

Andrews's theory of segregation was never clear.  As noted, he has not produced evidence that UGA's hiring practices are racially discriminatory, and Andrews never applied to work at UGA.  Doc. 26 at 71:3-23.  But in any event, Andrews's

---

[8] Andrews also argues that, as an alternative employment practice, the Board could simply mandate that FVSU and UGA Extension Service agents receive equal salaries.  Doc. 44 at 11-12.  Generally, an alternative employment practice is an alternative to one of the practices that allegedly caused the disparity—not just a remedy for the results of that practice.  Equalizing salaries, therefore, is not an alternative employment practice.  Additionally, mandating that FVSU redirect funds from other programs for the purpose of giving raises to Extension Service agents would interfere with its ability to manage its budget.  Further, it would risk creating salary imbalances between FVSU Extension Service agents and other FVSU employees: Latimore testified that FVSU "does not have a system where one unit can make the decision to pay its employees whatever it desires.  Such a system, in my opinion, would be a moral [sic] killer for the university as a whole."  Doc. 36-7 ¶ 5.

counsel clarified at the hearing that at this stage of the case, "[t]here is not a separate claim" for segregation.  Doc. 49 at 42:20-22; *see also* Doc. 44-1 at 13 (arguing that his segregation claim "is part of his disparate impact claim").  Rather, the segregation claim rests wholly on the disparate impact claim.  *Id*.  Because the disparate impact claim fails, the complaint's segregation claim is, to the extent it remains in the case, also subject to summary judgment for the same reasons described above.

## C. Disparate treatment

Andrews argues two theories of disparate treatment: a *McDonnell Douglas* theory and a convincing mosaic theory.  The convincing mosaic theory is mostly propounded in a supplemental brief filed in response to the Court's attempt, at a hearing, to articulate Andrews's argument.

### 1. McDonnell Douglas

"To make out a prima facie case of unequal pay under *McDonnell Douglas*, the plaintiff must show that (1) she belongs to a protected class; (2) she received low wages; (3) similarly-situated comparators outside of her protected class received higher compensation; and (4) she was qualified to receive that higher wage."  *Vinson v. Tedders*, 844 F. App'x 211, 213 (11th Cir. 2021).

The Board argues that Andrews has not identified a comparator and cannot show he is qualified for a higher wage.  Doc. 36-1 at 5-11.  Instead of identifying a specific comparator or several specific comparators, Andrews compares himself to the *group* of Extension Service agents at UGA.[9]  Because Andrews has not identified any individuals

---

[9] Although Andrews does not argue an individual comparator in his brief, his statement of material facts includes a reference to "his UGA counterpart, J. Raymond Joyce."  Doc. 44-2 ¶ 8.  However, Andrews does not argue Joyce is his comparator, and if he did, the minimal record evidence about Joyce would not allow a jury to conclude Joyce is similarly situated to Andrews in all material respects.

as comparators or produced evidence about any individuals as comparators, he has produced no evidence that anyone was "similarly situated in all material respects." *Lewis v. City of Union City, Georgia*, 918 F.3d 1213, 1227 (11th Cir. 2019).  Nor can the Court even assess, under the comparator standard articulated in *Lewis*, whether Andrews is similarly situated in all material respects to a group.  However, to the extent that analysis is even possible, it is clear Andrews is not similarly situated to UGA Extension Service agents.[10]

In *Lewis*, the Eleventh Circuit provided guideposts for evaluating comparators in adverse action cases.  "Ordinarily," a similarly situated comparator "will have engaged in the same basic conduct (or misconduct)," "will have been subject to the same employment policy, guideline, or rule," "will ordinarily (although not invariably) have been under the jurisdiction of the same supervisor," and "will share the plaintiff's employment or disciplinary history."  *Id*. at 1228.  In this pay disparity claim, not all of these factors apply.  But, Andrews had a different supervisor and worked for a different institution.  The Court also considers additional factors, not listed in *Lewis*, but relevant to a claim for pay discrimination: as noted, the institutions had different budgets, different funding channels, and different decisionmakers setting the salaries for

---

[10] Another flaw in Andrews's attempt to use the group of UGA Extension Service agents as comparators is that UGA Extension Service agents, as a group, are not outside Andrews's protected class.  As the Court noted in its discussion of Andrews's expert evidence on the disparate impact claim, *supra*, the fact that an institution is composed of *mostly* white employees does not allow a plaintiff to merely show evidence of institutional disparities, assume that equates to racial disparities, and prevail.  Again, Andrews points to no authority allowing him to take that shortcut to proving his claims.

Extension Service agents.  Docs. 44-1 ¶¶ 6;[11] 19;[12] 24;[13] 36-6 ¶¶ 19-21.  Because

Andrews has not pointed to any comparators who are similarly situated "in all material

respects," he cannot make out a prima facie case.[14]

Even if he could, the Board has shown legitimate, non-discriminatory reasons for

allowing Extension Service agents at UGA and FVSU to be paid differently.  First, it

delegates salary decisions to institutions.  Doc. 36-5 ¶¶ 5-6.  Juanita Hicks, Vice

Chancellor of Human Resources for the Board, testified that individual institutions are

best placed to decide salaries.  *Id*. ¶ 6.  She also testified that UGA and FVSU have

different sizes and missions.  *Id*. ¶ 11.  Second, as noted, the budget decisions which

ultimately bear on salary are made primarily by actors other than the Board.[15]  Andrews

---

[11] Andrews denies in part that salary decisions are made at the institutional level, arguing that each institution's President does not have "unfettered" authority to make decisions and that Presidents must follow Board policies and a human resources manual.  Doc. 44-1 ¶ 6.  The fact that Presidents' authority is subject to some policy constraints does not negate the fact that salary decisions are made at an institutional level.

[12] Andrews denies in part that FVSU is funded by the USDA, matching state funding, and, in the case of three Extension Service agents, county supplements.  Doc. 44-1 ¶ 19.  The reason Andrews denies this is that FVSU also receives some funding from federal grants.  In any event, there is no dispute that the institutions are funded separately.

[13] Andrews denies in part that UGA Extension Service agents' salaries are set by UGA administrators for the sole reason that some Extension Service agents also receive county supplements and perks.  Doc. 44-1 ¶ 24.  Still, the point is that UGA's sources of funding are different from FVSU's.  To the extent county supplements and perks could fund both, Andrews has not named any counties as defendants or shown evidence that the Board is responsible for those disparities.  To the extent the General Assembly and Governor affect funding for the Extension Service, they are not named as defendants, and Andrews has not shown evidence that the Board is responsible for the decisions of either of those entities.  *See* Doc. 36-6 ¶ 21.

[14] The Board also argues that Andrews is not qualified, because he lacks a Master's degree, which is a requirement for employees of the UGA Extension Service.  But as Andrews correctly notes, that requirement was introduced in 2015, and Extension Service agents hired before then, as Andrews was, do not appear to have been required to obtain Master's degrees.  In any event, because Andrews fails to show a comparator, the Court need not address the qualification prong of the prima facie case.

[15] Andrews argues that because Hicks assumed her position in February 2019, she lacks personal knowledge of why the Board decided to adopt that policy.  Doc. 44-1 ¶¶ 5-6.  Before assuming her current position, Hicks worked in Human Resources in the University System of Georgia for nine years.  Doc. 29 at 8:24-10:3.  Accordingly, she has ample experience with the University system to understand the advantages of allowing each institution to set its own budget.

has introduced no evidence showing those reasons are unworthy of credence.  For those reasons, Andrews's claim fails under the *McDonnell Douglas* framework.

   *2. Convincing Mosaic*

   Successfully constructing a *McDonnell Douglas* framework is not "the *sine qua non* for a plaintiff to survive a summary judgment motion in an employment discrimination case."  *Smith v. Lockheed-Martin Corp.*, 644 F.3d 1321, 1328 (11th Cir. 2011).  A plaintiff can always survive summary judgment by creating a triable issue concerning the employer's discriminatory intent.  A plaintiff does this by presenting "'a convincing mosaic of circumstantial evidence that would allow a jury to infer intentional discrimination by the decisionmaker.'"  *Id.* (quoting *Silverman v. Bd. Of Educ.*, 637 F.3d 729, 734 (7th Cir. 2011)).

   Andrews first argues that he and his UGA counterparts "perform the same job, in the same counties, have similar education, receive the same training after hire, and the two programs collaborate and develop a Joint Plan of Work."  Doc. 44 at 14.  Marc Thomas, Director of Field Operations for the FVSU Extension Service, testified the Extension Service agents at both institutions have similar work responsibilities.  Docs. 33 at 7:17-8:1, 44:7-46:18; 44-5 at 1.  The Board correctly notes that his personal knowledge of UGA Extension Service agents' responsibilities is limited.  Doc. 46-1 ¶ 3.  As to training, Andrews testified that all Extension Service agents receive the same training.[16]  The Board did not produce evidence to the contrary.  As noted, UGA Extension Service agents have had more education since

---

[16] The Board objects that Andrews testified only that he attended the same winter school as UGA Extension Service agents and did not know about UGA's training requirements.  Doc. 46-1 ¶ 4.

2015, when UGA started requiring a Master's degree, but some Extension Service agents hired prior to 2015 do not have Master's degrees.

Andrews's brief also discussed the history of the two programs.  However, Andrews did not explain how he believes that history fits with his legal claims.  But in an abundance of caution, the Court construes the brief liberally and considers the history as part of evaluating whether Andrews has produced a convincing mosaic.  Andrews asserts that Congress passed two land grant acts for colleges: one in 1862, for state colleges "specializing in agriculture and mechanic arts," and one in 1890 "which provided appropriations to support Land-Grant institutions at 17 predominantly African American colleges."  Doc. 44 at 2.[17]  In 1914, Andrews states, "the Smith-Lever Act created the Cooperative Extension Service to aid in the dissemination of public useful and practical information about agriculture and home economics, among other things, through a cooperative relationship between Land-Grant Colleges and the USDA."  *Id*. at 3.  "At some point in time," Andrews writes, "the FVSU Cooperative Extension Program was no longer a part of the Georgia Cooperative Service," though he was unable to discover when that was.  *Id*.

Andrews also asserts that "throughout the 70's and 80's, the [Board of Regents] was subject to a desegregation plan, which included eliminating the vestiges of segregation and eliminating racial disparities in the Cooperative Extension Programs, and was advised of its ongoing duty to affirmatively ensure that there was no race discrimination in the Cooperative Extension Service."  *Id*. at 6.  He includes a string-cite

---

[17] Andrews cites to a book available online at a location hyperlinked in his brief.  The Court attempted to view the source but lacked the web account required to access it.  For purposes of discussion, the Court is setting aside the various evidentiary issues with this and much of Andrews's other evidence bearing on this history.

to documents indicating the following facts, which the Court addresses below in the order they were cited:

- In February 1988, the Chancellor of the Board wrote the Board of Regents a memorandum referencing a February 1988 compliance letter from the "OCR" [apparently the Office for Civil Rights of the Department of Education] noting deficiencies in three areas.  One of those areas was "organization of the Extension Programs at UGA and FVSC."[18]  The Chancellor noted he "was under the impression that we had fully complied and was unaware that we had a commitment 'to administer jointly' the extension programs at UGA and FVSC."  Doc. 44-20.

- That OCR letter reveals the Board appears to have agreed to a desegregation plan in 1979 that was amended in 1983 and expired in 1985.  The plan included "a wide range of affirmative measures . . . designed to eliminate illegal vestiges of prior de jure segregation in three areas of higher education," including "disestablishment of the dual system and enhancement of traditionally black institutions."  Doc. 44-42 at 1.  At the end, the letter states that if Georgia failed to implement those measures by December 31, 1988, the OCR would terminate federal financial assistance.  *Id*. at 7.

- At a meeting of the "Fort Valley State College Associate Agricultural Research Center Joint Committee" in April 1978, "Vice Chancellor Hooper stated that the committee, formed in response to the court order in 1975,

---

[18] FVSC was formerly an abbreviation for FVSU.

should continue with its original charge.  Stated reasons were: (1) the Court Order of August 11, 1975 continues, (2) to assure we have a single-operating Cooperative Extension Service in Georgia.  Regardless of the final interpretation of the recent Federal Legislation (1977 Farm Bill), the Board of Regents is responsible to see that we have one unified extension service."  Doc. 44-39 (minutes sheet of meeting).

- Andrews cites the first page of a report by the same Joint Committee Report discussing "a range of option definitions for the further desegregation of all agricultural programs at Fort Valley State College." Doc. 44-40 at 1.[19]

- He also cites a September 1978 "Comprehensive Program of State Extension Work for Georgia submitted by The University of Georgia and Fort Valley State College."  Doc. 44-41.  The program maintained FVSU and UGA as distinct units but noted FVSU would embark on an initiative to provide assistance and education with a focus on small farmers.  *See generally id*.  Those programs would be "coordinated and supervised in conjunction with University of Georgia Cooperative Extension Service and the County Extension Director."  *Id*. at 7.  It noted that "[b]oth institutions,

---

[19] The remainder of the document adds context.  Stating that "[t]he goal is the achievement of a coordinated and unified agricultural program between the two institutions," the report discusses Option 16: "Development of a Middle Georgia center of excellence in agricultural resident instruction, research and extension at Fort Valley State Collect – emphasis (concentration) on limited resources-small farm and urban agriculture."  Doc. 44-40 at 2.  Option 1 was building a new campus, somewhere like Macon, to be the only agricultural program in the state.  *Id*. at 14.  Option 2 was moving all UGA's programs into FVSU, and Option 3 was moving all agricultural programs to Macon Junior College.  *Id*. at 14-15.  Option 4 was strengthening FVSU's program, Option 6 was closing down FVSU's agricultural programs, Option 15 proposed "[a] close association [between the extensions] without intermingling of funds of the two institutions[,]" and so on.  Doc. 44-40 at 18-23.  In any event, it is not at all clear that anyone believed combining the programs into one was necessary to comply with desegregation mandates.

as well as Georgia's citizens, should benefit from the proposed delineation of responsibilities" and had a term of five years, effective from September 1, 1978.  *Id*. at 8.

- The Executive Director of Kentucky's Council on Higher Education wrote an August 1988 memorandum in which he asserted that "Georgia's state plan expired in December 1985" but the state continued to voluntarily submit annual progress reports.  Doc. 44-43 at 5.  The memorandum referred to the OCR's February letter to Georgia and explained that, "[a]ccording to the state, provisions of land grant and other legislation raise problems for federal funding of the program if it were to be jointly administered as OCR recommended, and the state has written to OCR explaining this situation."  *Id*.

- In an April 1988 letter, Art Dunning, Vice Chancellor for Services and Minority Affairs, informed the Chancellor he had spoken with the Assistant Secretary for Civil Rights at the OCR and, after they talked, she "did not offer any objections regarding our present operation and organizational structure nor did they offer any evidence or information that the University System had determined to jointly administer or combine the programs. She recommended that we describe our efforts to coordinate the extension services of Fort Valley State College / University of Georgia." Doc. 44-45 at 1-2.

- In May 1988, the Chancellor then wrote a memorandum to the Board informing them of Dunning's meeting with OCR and included part of the

Board's compliance response to OCR.  The compliance response claimed that the 1977 Farm Bill mandated that Extension Service funds go directly to FVSC, rather than through UGA.  The response also asserted that "[a]ny previous reference by either the University System or OCR to combining or jointly administering the two extension programs has not been found.  A commitment to strong coordination and cooperation was made and that commitment has been accomplished."  Doc. 44-46 at 2-3.

- In March 1989, the Chancellor informed the Board of Regents "the Office for Civil Rights has determined that Georgia has substantially complied with the terms of its Desegregation Plan and is now in compliance with Title VI."  Doc. 44-47 at 1.  It also included the OCR letter informing Georgia it was in substantial compliance, and that letter noted that "although OCR's February 9, 1988, letter characterized the commitment regarding the cooperative Agricultural Extension Program between UGA and FVSC as conducting 'joint administration' of the program, the Plan language specified that there would be integration and coordination of the two institutions' agricultural programs. . . . OCR has determined that Georgia has carried out the measures specified in OCR's February 9, 1988, letter, and that Georgia has substantially complied with the terms of the Plan.  Accordingly, Georgia's system of public higher education is now in compliance with Title VI, and no additional desegregation measures will be required by OCR."  *Id*. at 2-3.

That history, in combination with pay disparities, does not create a convincing mosaic of circumstantial evidence from which a jury could infer that Andrews's lower pay vis-à-vis UGA Extension Service agents is the result of intentional discrimination by the Board. Nor is it evidence that Andrews's compensation is a vestige of past *de jure* segregation.

At the hearing, the Court struggled to understand how Andrews's historical arguments related to his claims, but wondered whether they could be relevant to a convincing mosaic argument.  The Court then ordered the parties to file supplemental briefs on the narrow issue of what the Court construed as Andrews's theory that the Extension Service was separated into two institutions for the purpose of avoiding desegregation.  Doc. 49 at 48:16-50:3.  Andrews makes several arguments in his brief.

Andrews's argument in the brief appears to start with the premise that UGA and FVSU work closely together—they submitted joint plans of work to the USDA every five years; they developed joint communications guidelines; and they engaged in joint programming.  From this he concludes the programs are "jointly administered."  Doc. 52 at 5-7.  It is unclear exactly what Andrews means by "jointly administered."  Certainly it is undisputed that UGA and FVSU work together on some projects.  But it is equally clear they are not the same thing and do not do exactly the same work: one example Andrews gives of a "joint partnership" is "FVSU being given responsibility for the Small Ruminants Program (i.e., goats and sheep) and the Aquaculture Program, and UGA has responsibility for the Large Ruminants Program."  *Id*. at 7.  If Andrews's point is that the two Extension Services coordinate with each other to pursue similar missions and sometimes share resources, that point is taken.

Because the two programs are "jointly administered," Andrews argues, "it

is appropriate to compare the UGA and FVSU ANR Agents' Salaries."  *Id*.  Indeed,

Andrews argues the group UGA Extension Service agents are "similarly situated in all

material respects" because differences in funding channels, salary decisionmakers, and

supervisors are not material.  *Id*. at 8.  For Andrews, then, the upshot appears to be not

a piece of a "convincing mosaic," but rather an attempt to bolster his argument for a

*McDonnell Douglas* comparator.[20]

But the Court rejects that argument: Andrews's own brief discusses separate

sources of funding, and there is no evidence the Board controls how much money the

USDA gives each institution or the statutory scheme that directs how that money is

distributed.  Andrews did not name the USDA or Secretary of Agriculture as defendants,

did not assert claims under 42 U.S.C. § 1983, and does not argue that the relevant

federal statutes were implicitly repealed by Title VII.  Again, differences in funding,

budget, and salary decisionmaker are clearly material for purposes of showing a

comparator in a pay discrimination claim.[21]

Next, Andrews argues "[t]he FVSU Cooperative Extension Program is a

remaining vestige of the University System of Georgia's segregated past."[22]  Doc. 52 at

8.  Andrews cites a state advisory committee's 1967 report concluding that there were

---

[20] Parts of it also sound like an attempt to bolster his disparate impact claim.  Again, the Court has trouble discerning precisely how Andrews's facts and his claims fit together.  But it still does not get Andrews around the distinction between institutional disparities and racial disparities, to say nothing of the other issues with the disparate impact claim.

[21] Even though Andrews attempts to use this historical evidence to argue for a watered-down version of the *Lewis* standard for proving a comparator, the Court addresses it in the convincing mosaic section because the evidence is more relevant to Andrews's convincing mosaic theory.

[22] Notably, Andrews does not expressly argue that the current pay disparity between the two programs is a vestige of that *de jure* segregation or was caused by the alleged *de jure* segregation of the 1960's.  *See* Doc. 52 at 8-12.

patterns of segregation and pay disparities between white agents and African American agents in the UGA Extension Service.  *Id*. at 9-10; *see generally* Doc. 44-37.  The committee recommended several measures to equalize salaries.  *Id*. at 10-11.  Andrews claims those specific recommendations were never implemented.  *Id*. at 11.  He also claims there is no evidence that state institutions submitted plans to address discrimination that were required by 1968 USDA regulations.  *Id*. at 11-12.

Furthermore, Andrews notes that Georgia created the FVSU Extension Service in 1972, the same year that Congress broadened Title VII to include public employees. *Id*. at 12.  Certainly Andrews has produced some evidence that the Extension Service system as a whole was tainted by racial animus in the 1960s.  But, according to his evidence, the Board was deemed in substantial compliance with Title VI by the OCR in 1988, and Andrews has not produced evidence it was under a judicial desegregation order more recently than the 1980s.[23]  And as the Board points out, none of the documents to which Andrews cites give any indication that FVSU's Extension Service was created to avoid desegregation or that the Board's reasons for creating FVSU's Extension Service are unworthy of credence.

Tellingly, Andrews's supplemental brief also attempts to pivot on the "practice" he identifies as causing a disparate impact.  He argues that "Plaintiff submits the reason there is no money is due to the method by which funds are dispersed to FVSU compared to UGA."  Doc. 52 at 18 (citing Doc. 44 at 9).  There is at least some evidence that FVSU's inability to implement the Carl Vinson compensation plan is due

---

[23] There is no evidence in the record of the scope of the desegregation order that Andrews asserts the Board was under, nor of its ultimate resolution.  The record does give some indication that the court order expired in 1985, Doc. 44-42 at 1, but it is not clear whether the court declared the system unitary.

to lack of funds.  But again, Andrews has not produced evidence the Board of Regents controls funding, nor has he sued the entities that do control funding.

Simply put, the historical evidence Andrews cites does not support his contention that the difference between Andrews's salary as a FVSU Extension Service agent and the salaries of his predominantly white UGA Extension Service colleagues is a vestige of *de jure* segregation.  A primary reason for the difference, as Andrews concedes, is FVSU's lack of funding, and there is no evidence that lack of funding is due to a policy or practice of the Board.  Finally, he has produced no evidence that UGA's Extension Service discriminates against African American applicants in hiring.

For those reasons, Andrews has not produced a convincing mosaic of circumstantial evidence that would allow a jury to infer the difference between his pay as a FVSU Extension Service agent and that of UGA Extension Service agents is the result of intentional discrimination.

## III. CONCLUSION

For those reasons, the Board of Regents's motion for summary judgment (Doc. 36) is **GRANTED**.

**SO ORDERED**, this 4th day of October, 2021.

S/ Marc T. Treadwell
MARC T. TREADWELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT
